**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 3:14-cr-215 (JAM) |
| PAUL PERROTTI | |

**ORDER DENYING POST-TRIAL MOTIONS**

Defendant Paul Perrotti is the former Fire Chief for the Town of Middlebury,

Connecticut. A federal trial jury found him guilty of two counts of defrauding the Town, in

violation of 18 U.S.C. § 666(a)(1)(A). Defendant has now moved for judgment of acquittal

pursuant to Fed. R. Crim. P. 29(c), for a new trial pursuant to Fed. R. Crim. P. 33, and for an

arrest of judgment pursuant to Fed. R. Crim. P. 34. For the reasons set forth below, the Court

denies these motions.

BACKGROUND

Defendant was charged with theft from a Town of Middlebury program involving federal

funds for each of the years 2011, 2012, and 2013. The allegations stemmed from defendant's

dual roles as Fire Chief for the Town of Middlebury and as president of the Middlebury

Volunteer Fire Department. Although defendant served as a "volunteer" president of the Fire

Department, he received a monthly stipend and other benefits from the Town for his additional

service as Fire Chief. Govt.'s Exs. 10B-10C.

The Middlebury Volunteer Fire Department is a separately incorporated non-profit public

service organization that is legally distinct from the Town of Middlebury. Govt.'s Ex. 8.

Defendant was routinely involved with submissions to the Town of bills and other

reimbursement requests for funds relating to the Fire Department and the upkeep of the Fire Department buildings (which were owned by the Town).

Defendant also owned and operated a private electrical service business known as Paul Perrotti Electric, Inc. (PPE). He performed electrician services through PPE for a wide range of customers. Importantly, the Town had a conflict-of-interest policy spelled out in the Town Charter that restricted any Town employee from contracting with or providing services for the Town for the employee's personal benefit. Def.'s Ex. 1.

The trial evidence in this case focused on the Government's contention that defendant defrauded the Town of Middlebury in connection with payments sought from the Town for expense requests purportedly involving the Fire Department or the Town-owned firehouses. More specifically, the Government introduced evidence to prove that defendant defrauded the Town in three principal ways:

(A) by fraudulently billing the Town for electrical parts that he ordered and used for his private electric business;

(B) by fraudulently billing the Town for labor costs of two workers—Max Biggins and Andrew Ubaldi—who performed services for defendant's private electric business; and

(C) by fraudulently billing the Town for certain electrical services that he performed for the Fire Department in violation of the Town's conflict-of-interest policy (*i.e.*, by concealing from the Town that he had performed the billed-for services).

Because it is important to defendant's challenge to the sufficiency of the evidence, it is necessary to describe here the scope of evidence for each of these three categories of claimed fraud with some numerical detail.

### A. Fraudulent Billing of Town for Electrical Parts

As noted above, the Government introduced evidence to support its contention that defendant fraudulently billed the Town for electrical parts that he used for his private electric

business. The proof on this point was highly circumstantial. First, the Government asked the jury to infer fraud from the fact that the Fire Department billed the Town far more for electrical parts than did other departments of the Town. Thus, the evidence showed that the Town's total expenditures for electrical equipment for the fire department in 2012 was $8,492 in 2012 and $4,644 in 2013, well in excess of the amounts of $3,471 in 2012 and $1,157 in 2013 that were incurred for the rest of the Town's buildings combined. *See* Govt.'s Ex. 75 (summary).[1]

Beyond this expenditure disparity, the Government tried to show that some of the electrical parts billed to the Town were similar to parts that defendant had used for his private electrical business. Special Agent Waterman of the FBI did a side-by-side comparison of Town-billed invoices and invoices subpoenaed from PPE. Although a few parts among the dozens upon dozens of electrical parts descriptions appeared somewhat similar across the respective invoices, there were no precise matches to irrefutably suggest that any particular electrical part that had been billed to the Town had in fact been used by defendant for the private profit of his electrical business.

In addition, the Government sought to show that many of the electrical parts for which the Town had been billed were not actually installed at any of the Town's firehouses. On the basis of testimony of by Kevin Dawes—a town employee who conducted a survey of the firehouses—the Government contended that a range of electrical supplies such as certain specialized circuit breakers, door chimes, exit signs, and at least one generator could not be found installed or in storage. Cross-examination as well as defendant's own testimony disputed

---

[1] At the oral argument of this motion, defendant surprisingly claimed for the first time that he did not have adequate notice that the Government would base its claim of fraud in large part on the disparity in electrical parts orders between the Fire Department and other Town departments. I reject this argument on the ground that defendant had ample notice of the Government's exhibits in this case—including the specific invoices as well as the Government's summary of all the Town's electrical parts billings (Govt.'s Ex. 75) from which it was obvious that the Government could—and would—contend that diversion and misuse of the electrical parts could be inferred in part from the fact that so high a proportion of the Town's electrical parts purchases were for the Fire Department.

this evidence, and it was convincingly shown that Dawes had failed to survey all relevant areas, including a Fire Department storage trailer.

The Government also cited the fact that defendant did not obtain permits for the electrical work that he claimed to have engaged in for the Town's benefit at the firehouse. In response, defendant contended that the pulling of permits for his electrical work was not always required by law or by customary practice.

### B. Fraudulent Billing of Town for Labor Costs of PPE Workers

The Government sought to prove that defendant fraudulently billed the Town for certain labor services performed by two workers—Andrew Ubaldi and Max Biggins—that were performed for PPE. Although Ubaldi and Biggins both volunteered at the Fire Department, it was undisputed that they also worked for PPE, and the Government's contention was that some of their PPE labor services were fraudulently billed by defendant to the Town on the pretext that they were performing remunerative services for the Fire Department. Records showed that certain of Ubaldi's services were billed to the Town for $2,735 in 2012 and for $248 in 2013 and that certain of Biggins' services were billed to the Town for $3,100 in 2013. Govt.'s Exs. 47-52, 72B, 87-95. Although subject to impeachment for prior inconsistent statements, both Ubaldi and Biggins testified that they did not know why their services had been billed to the Town. Biggins, in particular, told the jury that he was surprised to receive checks from the Town for services that he had performed for defendant's private business and not for the Town or the Fire Department.

Perhaps the most important piece of evidence for the Government at trial was a secretly tape-recorded telephone conversation between Biggins and defendant in the immediate aftermath of an FBI search of defendant's office at the Town's main firehouse and when it had become apparent to defendant that he was under federal investigation. By then, Biggins was cooperating

4

with the Government (he was never charged) and agreed to record his telephone calls with defendant. On one of the calls, Biggins questioned defendant about the payments he had received from the Town. Defendant responded that these Town payments had come from defendant's own "stipend" that was paid to defendant by the Town for his services as Fire Chief. Govt.'s Ex. 73.

The trouble with this explanation was that there was no evidence that defendant's Town-paid stipend as Fire Chief was ever reduced for any amounts paid by the Town to Biggins. Nor would there be any plausible or legitimate business reason for defendant to pay Biggins from Town funds and then to draw down on his own stipend or salary to reimburse the Town.

Other statements by defendant to Biggins were also suggestive of a less than innocent mind. Defendant told Biggins, for example, that "I'm trying to back track in my mind to make sure that we cover everything [if] you know what I mean." *Ibid.* And defendant suggested to Biggins that if he was asked what work he did for the Town in return for the payments he received, he should say: "Apparatus cleaning [of fire department equipment], same thing as what [Andrew] Ubaldi does." *Ibid.*

### C. Fraudulent Billing of Town for Defendant's Services

The Government also introduced evidence to show that defendant engaged in disguised billing of the Town for certain services that he personally performed in alleged violation of the Town's conflict-of-interest policy. Defendant had previously been censured by the Town for failing to abide by the conflict-of-interest policy. Govt.'s Ex. 86. The Government's claim was that defendant's knowledge of the conflict-of-interest policy led him to manipulate at least three series of transactions (described below) involving the Town so as to conceal his own involvement and his personal benefit from the furnishing of services that were to be paid for by the Town.

5

*Gutter Heat Work / Astro Electric*:  In February 2012, defendant installed gutter heating at one of the Town's firehouses. Instead of directly billing the Town for this work, he arranged for an invoice to be submitted to the Town in the name of another company—Astro Electric, Inc. (Astro)—and then, after the Town paid Astro, he obtained the $700 he had charged for this work from Astro. Govt.'s Exs. 45A-45D.

*Firefighter Training Services*: In June 2012, defendant received a $2,000 check from the Fire Department for certain firefighter training/instructional services with which he was involved. At defendant's behest, the Fire Department in turn billed the Town for these firefighter training services but without disclosing defendant's connection to or receipt of money for these services. Govt.'s Exs. 46A-46B.

*Rooftop Electrical Work*: In November 2013, defendant performed certain rooftop electrical work at the Town-owned firehouse for which his company—PPE—billed the Fire Department in the amount of $1,450. Defendant then orchestrated the Fire Department's generation of an invoice to bill the Town for this work while conspicuously omitting from the invoice any identification that he or his business had furnished the electrical services. Govt.'s Exs. 53A-53C.

The Government otherwise presented additional evidence at trial that is not necessary to the Court's consideration of the pending motions. For his part, defendant testified at length over the course of nearly two days. Most of defendant's testimony was devoted to rebutting the Government's evidence that he had diverted electrical parts for the use of his business rather than for the benefit of the Fire Department. He testified about his own survey of the Town's firehouses and other locations, at which he took more than 300 photographs of electrical items in an effort to show that he had not misappropriated electrical parts that were billed to the Town.

The Government intensively cross-examined defendant. *See* Doc. #107 at 14-18 (summarizing impeachment evidence).

The jury deliberated for about three days before rendering a partial verdict. Although the jury was unable to reach a verdict that defendant had defrauded the Town of Middlebury during 2011, it returned verdicts of "Guilty" against the defendant for the years 2012 and 2013.

DISCUSSION

Defendant moves for judgment of acquittal pursuant to Fed. R. Crim. P. 29(c), for a new trial pursuant to Fed. R. Crim. P. 33, and for an arrest of judgment pursuant to Fed. R. Crim. P. 34. Each of these motions is addressed in turn below.

**Motion for New Trial Pursuant to Fed. R. Crim. P. 29**

The standard governing the Court's review of defendant's motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 is well established. The Court must review the evidence in the light most favorable to the prosecution and sustain the jury's verdict if any rational trier of fact could have found the evidence sufficient to establish the elements of each crime beyond a reasonable doubt. *See United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015) (*citing Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Hoffa v. United States*, 385 U.S. 293, 311 (1966).

The charges under 18 U.S.C. § 666(a)(1)(A) in this case required the Government to prove the following elements:

(1) that defendant was an employee of the Town of Middlebury;
(2) that the Town of Middlebury received federal benefits of more than $10,000 in the relevant year;

(3) that defendant wrongfully took certain property or money by means of fraud or other intentional conversion or misappropriation;

(4) that the property or money belonged to the Town of Middlebury; and

(5) that the value of the property or money taken for each year was at least $5,000.

Defendant's Rule 29 motion presses a single argument: that the evidence did not suffice to establish the last of the five elements—that defendant defrauded the Town of more than $5,000 in 2012 or 2013.[2] In response, the Government identifies the following amounts (rounded to the nearest dollar) that it contends the jury could have credited to determine that the defendant met and exceeded the $5,000 threshold:

| ALLEGED FRAUDULENT BILLINGS | |
| --- | --- |
| 2012 Electrical Supplies Billed to Town | $ 8,492 |
| 2012 Payments to Andrew Ubaldi | $ 2,735 |
| 2012 Payment through Astro Electric | $   900 |
| 2012 Payment for Firefighter Training | $ 2,000 |
| **2012 TOTAL** | **$14,127** |
| | |
| 2013 Electrical Supplies Billed to Town | $ 4,644 |
| 2013 Payment to Andrew Ubaldi | $   248 |
| 2013 Payments to Max Biggins | $ 3,100 |
| 2013 Payment for Roof Work | $ 1,450 |
| **2013 TOTAL** | **$ 9,442** |

After crediting all inferences from the testimony and evidence in the Government's favor, I conclude that the evidence presented by the Government in its case-in-chief was easily sufficient to support a jury finding that defendant defrauded the Town of more than $5,000 in 2012 and 2013. To begin with, defendant conceded through counsel at oral argument of this motion that the evidence was legally sufficient for the jury to conclude that defendant engaged in fraudulent billing of the Town with respect to the payments to Ubaldi and Biggins. This was a

---

[2] To the extent that defendant would claim evidentiary shortcomings as to elements other than the $5,000 threshold, I reject these arguments for substantially the reasons set forth in the Government's opposition memorandum. Doc. #107 at 23-26. Because defendant moved for a judgment of acquittal at the close of the Government's case-in-chief, I have considered the sufficiency of the evidence for purposes of defendant's Rule 29 motion by reference only to evidence presented in the Government's case-in-chief.

sound concession in light of the fact that I may not engage in credibility determinations for purposes of resolving a Rule 29 motion. These payments to Ubaldi and Biggins alone account for *more than half* the required $5,000 threshold for each of the years 2012 and 2013.

Beyond considering the Ubaldi/Biggins payments, a reasonable jury could have concluded that the billing of the Town for transactions involving Astro Electric ($900 in 2012), firefighter training ($2,000 in 2012), and fire station roof work ($1,450 in 2013) involved fraudulent action by defendant. The jury could well have concluded that there was no plausible or honest reason why defendant's services would be initially billed to an intermediary entity (such as Astro Electric or the Fire Department) rather being billed directly to the Town. When I inquired of defendant's counsel at oral argument if there was some other ostensibly non-nefarious reason for defendant to have managed the transactions in this way that he did, counsel did not deny that a reasonable jury could have concluded that these transactions were arranged to evade the Town's conflict-of-interest restrictions by concealing defendant's involvement and financial benefit in the paperwork that was actually submitted to the Town.

The foregoing transactions involving Ubaldi, Biggins, Astro Electric, firefighter training, and roof work result in evidence of more than $5,000 defrauded in 2012 ($5,635) and only about $200 short of $5,000 defrauded in 2013 ($4,798). Therefore, it is almost unnecessary even to consider the evidentiary sufficiency of the Government's claims about fraudulent billing of electrical parts ($8,492 in 2012 and $4,644 in 2013).

In any event, despite the fact that the Government's proof was quite circumstantial as to the fraudulent billing of electrical parts, I conclude that a reasonable jury could have determined that defendant fraudulently billed the Town for at least several hundred dollars worth of electrical parts in 2012 and 2013. This conclusion could be permissibly based on the fact that the

Fire Department's billings for electrical parts far exceeded the billings for other buildings and departments in the Town, that some of the parts allegedly purchased for the firehouses could not be accounted for, and that defendant had not "pulled" permits for the electrical work he claimed to have done for the Town.[3]

This is by no means to suggest that the Government's evidence as to the fraudulent billing for electrical parts was overwhelming or particularly persuasive. Given the type of work performed by firefighters and the apparatus that they need, it would not be unusual for a Fire Department to need far more electrical parts than other town departments. Nor would it be unusual for a Fire Department that is headed by a trained electrician like defendant to be prone to invest intensively in electrical improvement projects. The fact of a disparity in expenditures was not particularly suggestive of outright fraud. The comparison by Agent Waterman of Town-paid parts to parts that appeared on PPE invoices only anemically suggested a specific correlation.[4] The survey conducted by Dawes for electrical parts installed at the firehouses appeared to be less than and inexplicably incomplete for failure to account for the Fire Department's storage trailer. And it is far from clear that defendant had to "pull" a permit for all the electrical work he did at the Fire Department (or that his failure to "pull" a permit for some of the electrical work likely meant that he did not do the work at all).

---

[3] At the oral argument of this matter, defendant advanced a variety of new claims of error that were not set forth in his motion papers. For example, defendant claimed that the Government was required to have called a *Daubert*-qualified expert and could not permissibly have asked the jury to draw "formula" inferences of fraudulent billing based in part on a comparison of the amounts paid by the Town for electrical parts for the Fire Department as compared to other Town departments. This argument has no merit, because the jury was asked to do no more than a simple mathematical comparison for which no expert was needed. Defendant also assailed the Government for failing to call more witnesses on certain points. But this argument overlooks the limited review function by the Court to determine if the evidence as presented was sufficient, rather than whether the Government could have proved its case in a more convincing fashion. In any event, any such new claims of error raised for the first time at the oral argument of these post-trial motions should have been set forth in defendant's motions papers and are deemed waived.

[4] Perhaps more telling, however, was that PPE failed to produce all of its invoices when subpoenaed for these records, such that the side-by-side comparison attempted by Agent Waterman was necessarily incomplete, and the jury could well have concluded that PPE's failure to produce complete records was for fear of disclosing incriminating information.

All these arguments notwithstanding, I conclude that they were for the jury to resolve and that a reasonable jury could have concluded in light of it all that some significant portion of the billings for electrical parts to the Town were fraudulent. I might view this quite differently if more of the Government's case for exceeding the $5,000 threshold necessarily rested on the strength of its evidence regarding fraudulent billing for electrical parts.[5] The evidence presented by the Government in its case-in-chief was legally sufficient to support defendant's convictions.

### Motion for New Trial Pursuant to Fed. R. Crim. P. 33

As to defendant's motion for new trial pursuant to Fed. R. Crim. P. 33, the Court may set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice. *See United States v. Truman*, 688 F.3d 129, 141 (2d Cir. 2012). "Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, '[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment,' " such as "where testimony is 'patently incredible or defies physical realities.' " *United States v. McCourty*, 562 F.3d 458, 475-76 (2d Cir. 2009) (alteration in original) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

Defendant's Rule 33 motion devotes but a paragraph to generally challenging the admission of certain evidence at trial under Fed. R. Evid. 404(b). Doc. #102 at 3. For all of the trial's Rule 404(b) evidence, however, I ensured that defendant had ample notice of the evidence in advance of trial, and I concluded that each item was offered for a proper and relevant purpose, that its probative value was not substantially outweighed by any unfairly prejudicial effect, and

---

[5] Indeed, it is quite likely that the jury was unwilling to conclude that even half of the Fire Department's electrical billings were fraudulent. This would explain why the jury did not reach a verdict as to the first count of the indictment that charged defendant with fraud in 2011, a year in which the Fire Department billed the Town for $12,787 in electrical parts (far more than in 2012 and 2013). The government's claim of fraud for 2011 relied almost entirely on its claim of fraudulent billing of the Town for electrical parts, rather than fraudulent billing for PPE employees or defendant's own services rendered in violation of the Town's conflict-of-interest policy.

that the evidence was received subject to numerous limiting and cautionary instructions at the time of its introduction and again in the final jury instructions so that the jury would not consider the evidence as improper "character" evidence. *See United States v. Moran-Toala*, 726 F.3d 334, 345-46 (2d Cir. 2013). None of the Rule 404(b) evidence was scandalous or inherently inflammatory in the least; it was evidence that paralleled the Government's main trial evidence and that could be appropriately considered by the jury as evidence of a common scheme or plan and the absence of mistake with respect to billing irregularities. Because defendant's memorandum does not otherwise develop this claim of error, I otherwise reject his Rule 404(b) arguments for those reasons set forth in the Government's opposition memorandum. Doc. #107 at 28-30.

Defendant next contends in a single sentence and without elaboration that the evidence did not establish that he was an "employee" of the Town of Middlebury. Doc. #102 at 1. It is true that the Fire Chief position is not specified as a Town Officer in the Town's Charter and that—rather than receiving a full living-wage salary—defendant received what was referred to as a "stipend" from the Town of about $7,800 per year to act as the Town's Fire Chief. Govt.'s Exs. 10B-10C. Still, the Government's evidence sufficed to show that defendant was an employee, because defendant received W-2 income from the Town, and he even signed a W-4 tax document identifying himself as an "employee." Govt.'s Exs. 10B-10C & 101. He also received for his use a Town-owned car, gasoline, and a cellular telephone; he performed budgetary services for the Town distinct from his role as volunteer president of the Fire Department; and he even supervised another full-time Town employee. Doc. #107 at 23-24 & 28. It would be beyond odd to conclude that the Town would subject its employees to the supervision of a *non*-Town

employee. At any rate, the evidence sufficed for the jury to conclude that defendant was a Town employee.

Defendant's Rule 33 motion otherwise relies on the same claim of evidentiary deficiency set forth in his Rule 29 motion. Even acknowledging that I have somewhat more discretion in the Rule 33 context to overturn a jury's verdict, I decline to exercise that discretion here. To be sure, this was a close case on the evidence. It is understandable why the jury took three days to reach even a partial verdict. I cannot say that I found the evidence to be overwhelming or of quite the strength and persuasiveness that the Government ordinarily presents at federal criminal trials. But I was not the constitutional fact finder in this case. The jury painstakingly and conscientiously did its job. It is especially important in my mind that defendant chose to testify, that he testified for nearly two days, and that the jury had a full opportunity to weigh his credibility and the extensive evidence he provided in his defense. There was no miscarriage of justice, and I cannot conclude that I am any better (or legitimate) a judge of the evidence and credibility than my twelve fellow citizens of the jury.

**Motion for Arrest of Judgment Pursuant to Fed. R. Crim. P. 34**

As to defendant's motion for arrest of judgment pursuant to Fed. R. Crim. P. 34, this infrequently-used rule "is explicit as to the grounds upon which a motion in arrest of judgment will lie: (1) the indictment must fail to 'charge an offense,' or (2) the court must be 'without jurisdiction of the offense charged.' " *United States v. Zisblatt*, 172 F.2d 740, 741 (2d Cir. 1949). A motion for arrest of judgment must rely on the face of the record—such as in the allegations of the indictment—and not upon any alleged defect in evidence or improper conduct at trial. *Ibid.*

Here, I cannot conclude that the Indictment failed to charge an offense or that the Court was without jurisdiction over this case. Although less than a model of clarity (for reasons

13

reviewed by the Court during pre-trial proceedings; see Doc. #35), the Indictment adequately

alleged each element of the charged federal crimes and vested the Court with subject-matter

jurisdiction over this case.

Defendant's Rule 34 motion renews defendant's challenges to the sufficiency of the

evidence to support his defrauding of the Town of $5,000 or more and his status as an employee

of the Town. Doc. #103 at 2-3. These arguments are rejected for the reasons discussed above.

Defendant further argues that the Court erred with respect to its jury instruction definition

of an "employee."  Doc. #103 at 3-4. But a claim of instructional error (or other trial error) is not

properly pursued by means of a motion to arrest judgment. *See Zisblatt*, 172 F.2d at 741. In any

event, the claim is also without merit for the same reasons that I set forth on the record at the

time of overruling defendant's objection to the Court's jury instructions.

The Court instructed the jury on the definition of "employee" as follows:

**Element One – Employee**
> In order to find that the first element is proven, you must find beyond a reasonable
> doubt that Mr. Perrotti was an employee of the Town of Middlebury during the year in
> question.
> The statute that Mr. Perrotti is charged with violating requires that the defendant
> be an "agent" of the Town of Middlebury. In this case, the prosecution alleges that Mr.
> Perrotti was an "agent" by virtue of his status as an "employee" of the Town of
> Middlebury.
> An "employee" is a person who is authorized to act on behalf of another person,
> organization, or government, and who works for wages or a salary.

Here, the Indictment apprised defendant of his status as *both* an "agent" and "employee"

of the Town of Middlebury. Doc. #1 at ¶¶ 5, 13, 15 & 17. This was in keeping with the charged

statute that applies in the first instance to any "agent" of a municipality like the Town of

Middletown and specifically includes by way of example of an agent any "employee" of a town.

*See* 18 U.S.C. § 666(a)(1) (proscribing conduct by an "agent" of a town); 18 U.S.C. § 666(d)(1)

(stating that "the term 'agent' means a person authorized to act on behalf of another person or a

14

government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative").

Arguably, the Court could have instructed the jury simply to determine whether defendant was an "agent" of the Town, because an "agent" is all that the statute requires. It is unclear why parts of the Indictment were drafted to allege that defendant was an "employee" when the statute required only that defendant be an "agent" of the Town of Middlebury, which he surely was as the Fire Chief of the Town of Middlebury.

Defendant misplaces his reliance on *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318 (1992), a civil case that involved a multi-factored definition of "employee" in a very different context for purposes of the Employee Retirement Income Security Act of 1974. Doc. #107 at 32. The technical, multi-factored definition of an employee that was adopted in *Darden*—and in a common law context designed to separate "employees" from "independent contractors" or other sub-species of agents, *see Darden*, 503 U.S. at 327—does not appropriately apply in the context of 18 U.S.C. § 666, a statute that is drafted to apply to any agent or employee who has defrauded municipalities receiving federal program funds. Defendant has yet to suggest a plausible reason why Congress would have intended the restrictive definition of "employee" that he proposes and how this restrictive definition would be consistent with the aims of § 666 to protect federal funds from criminal activity.

Research does not disclose a case addressing the specific definition of an "employee" in the context of 18 U.S.C. § 666(a)(1)(A). That is not surprising, because there is no reason to suppose—in light of the fact that the statute requires only that a defendant be an "agent" rather than an "employee"—that indictments elsewhere would be drafted and trials elsewhere required to determine if a defendant under § 666(a)(1)(A) was specifically an "employee."

Defendant's challenge to the jury instruction of "employee" is without merit. Moreover, I conclude that any possible instructional error would be harmless in view that the Indictment also alleged that defendant was an "agent" of the Town and that the evidence overwhelmingly established at least his "agent" status.

## CONCLUSION

For the foregoing reasons, defendant's motions for judgment of acquittal pursuant to Fed. R. Crim. P. 29 (Doc. #87), for a new trial pursuant to Fed. R. Crim. P. 33 (Doc. #102), and for an arrest of judgment pursuant to Fed. R. Crim. P. 34 (Doc. #103) are all DENIED. All other open trial-related motions on this docket (Docs. #62, 70, 74, 82) are DENIED as moot.

It is so ordered.

Dated at New Haven this 9th day of November 2015.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge