UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 3:14cr215(JAM) |
| | : | |
| | : | |
| PAUL PERROTTI | : | November 27, 2015 |

**GOVERNMENT'S MEMORANDUM OF LAW IN ANTICIPATION OF THE *FATICO* HEARING**

The Government respectfully submits this memorandum of law in anticipation of the *Fatico* hearing scheduled for January 28, 2016.

As detailed below, the Government submits that based upon the law and the anticipated facts to be determined by the Court, the defendant's advisory Sentencing Guidelines should be determined to be as follows:

- Base Offense Level under U.S.S.G. §2B1.1(a)(2) of 6;

- Eight-level enhancement under U.S.S.G. §2B1.1(b)(1)(E) because the loss exceeded $95,000 but was less than $150,000;[1]

- Two-level adjustment for role in the offense on the basis of abuse of trust under §3B1.3;

- Two-level adjustment for obstruction of justice under §3C1.1.

---

[1] The final Presentence Report, Doc. 112 (hereinafter "PSR") sets forth an enhancement of ten levels pursuant to § 2B1.1(b)(1)(F) of the November 1, 2014 Sentencing Guidelines, *see* PSR ¶ 37, but this subsection was amended as of November 1st of this year to adjust for inflation. As a result of the Guidelines amendment, the Government believes that the loss amount of approximately $112,000 shifts the analysis down one level to subsection (b)(1)(E). *See United States v. Kilkenny*, 493 F.3d 122, 126-127 (2d Cir. 2007) ("Ordinarily a sentencing court must apply the version of the Guidelines in effect on the date of the defendant's sentencing. At the same time we have recognized an exception to this general rule. When the application of the Guidelines in effect at the time of sentencing would result in a more severe penalty than would application of the Guidelines in effect at the time the offense was committed, the Ex Post Facto Clause requires the use of the earlier version of the Guidelines.").

- Total offense level of <u>18</u> with a Criminal History Category of I.

The resulting Guidelines range is therefore 27 to 33 months of imprisonment.[2]  These Guidelines

calculations are each discussed below:

## I.  THE BASE OFFENSE LEVEL FOR THEFT FROM A PROGRAM RECEIVING FEDERAL FUNDS IS 6

The Government concurs with the PSR ¶36 that the appropriate base offense level is 6

under U.S.S.G. §2B1.1(a)(2) because the defendant was convicted of two counts of theft from a

program receiving federal funds under 18 U.S.C. §666(a)(1), a ten-year felony.

## II.  BASED UPON THE DEFENDANT'S RELEVANT CONDUCT, EIGHT-LEVELS ARE ADDED UNDER U.S.S.G. §2B1.1(b)(E)

Next, the Government submits that eight levels should be added under U.S.S.G.

§2B1.1(b)(1)(E) because the loss amount is greater than $95,000 but less than $150,000.

### A.  <u>Legal Standard</u>

In calculating the Sentencing Guidelines applicable to a defendant, the district court need

only make a reasonable estimate of the loss attributable to their conduct.  *See* U.S.S.G. § 2B1.1

cmt. n. 3(C).  "Loss" is defined as the greater of actual loss or intended loss.  *Id.*, n. 3(A).

"Actual loss" is defined as the reasonably foreseeable pecuniary harm that resulted from the

offense; that is, pecuniary harm that the defendant knew or, under the circumstances, reasonably

should have known, was a potential result of the offense.  *Id.*, n. 3(A)(i), 3(A)(iv).  Relevant

conduct in determining the offense level includes "all acts and omissions committed, aided,

abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," as

---

[2] The Government concurs with the United States Probation Office, *see* PSR ¶107, that the Court may wish to consider a non-Guidelines sentence in light of some of the factors set forth in the PSR, including Mr. Perrotti's military service.  The Government intends to address the Court as to the specific sentence of imprisonment that it believes is appropriate under the section 3553(a) factors in its sentencing memorandum, which is to be filed after the *Fatico* hearing.

well as all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.  U.S.S.G. § 1B1.3(a)(1).  Relevant conduct also includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. §1B1.3(a)(2).

The Guidelines require "that relevant conduct *must* be taken into account in setting a defendant's Guidelines range," *United States v. Bryce*, 287 F.3d 249, 254 (2d Cir. 2002) (emphasis in original), and the Second Circuit has concluded that "relevant conduct" under §1B1.3(a) "is to be interpreted broadly."  *United States v. Silkowski*, 32 F.3d 682, 688 (2d Cir. 1994).  As the Court explained, "the consideration at sentencing of criminal acts not within the offense of conviction, far from being a unique product of the Guidelines, has been an established component of the district court's sentencing discretion long before the enactment of 1B1.3(a)(2)."  *Id.*  In *Silkowski*, the Court held that conduct outside of the statute of limitations was properly considered as "relevant conduct" in the Guidelines calculation, along with "conduct for which the defendant was acquitted, conduct related to dismissed counts of an indictment, conduct that predates that charged in the indictment, and conduct not charged in the indictment." *Id*. (internal citations omitted); *see also United States v. Yannotti*, 541 F.3d 112, 129 (2d Cir. 2008) ("We have consistently emphasized that a district court may consider all information adduced during trial, including acquitted conduct, when sentencing a defendant."); *United States v. Quintero*, 937 F.2d 95, 97 (2d Cir. 1991) ("Long prior to the sentencing guidelines it was settled that a sentence on a count of conviction could be based on conduct charged in dismissed counts, and even counts resulting in an acquittal.") (internal citations omitted).

Two or more offenses constitute part of a "common scheme or plan" if they are "substantially connected to each other by at least one common factor, such as common victims,

common accomplices, common purpose, or similar modus operandi."  U.S.S.G. §1B1.3 n. 9(A). The Second Circuit has identified several relevant factors to be used in determining whether or not offenses are part of a common scheme or plan:

> (1) the time period within which the offenses took place, (2) the participants involved, (3) the victims targeted, (4) the motive, (5) the modus operandi, (6) the geographic location of the crimes, (7) the substantive offenses committed, (8) whether the acts were uncovered by a common investigation; and (9) whether the offenses were jointly planned[.]

*United States v. Brothers*, 316 F.3d 120, 123-124 (2d Cir. 2003) (internal citations omitted).

Offenses that are not part of the same common scheme or plan may nonetheless qualify as relevant conduct if they are part of the "same course of conduct" as the count of conviction; that is, "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."  U.S.S.G. §1B1.3 n. 9(B).  "The term 'same course of conduct' has a meaning distinct from 'common scheme or plan' and, unlike the latter, does not require a connection between the acts."  *United States v. Burnett*, 968 F.2d 278, 280 (2d Cir. 1992).   "[O]ur analysis of whether a defendant's acts are relevant to the district court's base offense level calculation . . . focuses on whether defendant has engaged in an identifiable and repetitive behavior pattern of specific criminal activity[.]" *Silkowski*, 32 F.3d at 687; *see also United States Shonubi*, 998 F.2d at 84, 89 (2d Cir. 2003) ("To determine whether a defendant has been engaged in the same 'course of conduct,' a sentencing court looks to see if the defendant has been engaged over time in an identifiable pattern of criminal conduct."); *Azeem*, 946 F.2d at 16 (concluding that "same course of conduct" "looks to whether the defendant repeats the same type of criminal activity over time without requiring that the acts be connected by common participants or an over scheme."); *United States v. Cousineau*, 929 F.2d 64, 68 (2d Cir. 1991) (directing the district court to consider factors such as the nature

of the acts, the defendant's role, whether the acts were repeated, and whether the acts indicate a pattern of behavior).

For example, in *Slikowski*, the Second Circuit concluded that although the defendant only pleaded guilty to fraudulently receiving social security benefits for a discrete period of time, the district court properly considered his related theft of public funds outside the statute of limitations as relevant conduct because it was the "same type of criminal activity over time."  32 F.3d at 687.  Similarly, in *United States v. McCormick*, 993 F.2d 1012, 1013 (2d Cir. 1992), the Court of Appeals held that where the defendant had been convicted of bank fraud in Connecticut, the district court nonetheless correctly considered as part of the defendant's "relevant conduct" his pending charges related to a bank fraud in Vermont.  The Court explained that the two frauds were "perpetrated in the same style and with the same or similar documents and documentation, [and] fit into an identifiable criminal behavior pattern."  *Id.*

In making factual determinations relevant to a Guidelines determination, preponderance of the evidence is the standard to be applied by the Court.  *See, e.g., United States v. Watts*, 519 U.S. 148, 156 (1997) ("[A]pplication of the preponderance standard at sentencing generally satisfies due process."); *United States v. Singh*, 390 F.3d 168, 191 (2d Cir. 2004) ("It is well-settled that acquitted conduct can be taken into account in sentencing and that a preponderance of the evidence is all that is required to prove the amount of loss."); *United States v. Florez*, 447 F.3d 145, 156 (2d Cir. 2006) (explaining that the district court was allowed "to make its own preponderance finding of a higher drug quantity than the amount found by the jury); *United States v. Salazar*, 489 F.3d 555, 558 (2d Cir. 2007) ("[W]e conclude that the district court was required to use the preponderance of the evidence standard, as it did, in finding facts relevant to sentencing for Guidelines calculation purposes.").

**B.**      **Discussion**

Here, the exhibits and testimony presented at trial and to be presented to the Court at the *Fatico* hearing show by a preponderance of the evidence that the defendant's relevant conduct involved a loss of greater than $95,000.[3]  This relevant conduct includes the defendant's thefts from the Town of Middlebury as Fire Chief, and his related thefts from the Middlebury Volunteer Fire Department (hereinafter the "MVFD") as its President.  The defendant's actions against both entities were "perpetrated in the same style and with the same or similar documents and documentation, [and] fit into an identifiable criminal behavior pattern[,]"*McCormick*, 993 F.2d at 1013 and thus must be considered under U.S.S.G. § 1B1.3 in determining the applicable amount of loss.[4]

First, as to purchases for electrical supplies, the electrical wholesalers invoices show that the defendant's purchase of electrical supplies with Town and MVFD funds was 11, 36 and 56 times the magnitude spent by the Town of Middlebury for all of the other town buildings in 2011, 2012 and 2013, respectively.  *See* PSR ¶¶11-12; Gov't Ex. 11-40 (electrical wholesaler invoices submitted to the Town); Ex. 75 (summary of A/P by Town Department for electrical supplies); Gov't Ex. 302 (electrical wholesale invoices paid for by MVFD at defendant's direction).[5]  Recognizing that that the Court need only make a "reasonable" calculation of loss,

---

[3] The Government will only summarize the trial evidence in this memorandum as it has been outlined in detail in the Government's post-trial submission, Doc. 107.

[4] Indeed, the scheme involving the theft from the Town of Middlebury was often inextricably intertwined with the scheme to steal from the MVFD.  For example, the defendant paid volunteer MVFD firefighter Max Biggins in connection with work done for the defendant's business with a series of checks from the Town of Middlebury and the MVFD.  The Government notes that the various thefts are broken out in the PSR as to those related to the Town ($37,065.32) and those related to the MVFD for purposes of calculating the appropriate restitution order.

[5] Government exhibits numbered 300 and higher are exhibits anticipated to be offered at the *Fatico* hearing but are generally described herein.  These documents were provided during the discovery process to the defendant and to the United State Probation Office.

U.S.S.G. § 2B1.1, cmt. n. 3(C), and applying a preponderance of the evidence standard, the Government proposes the following as to losses attributable to electrical supplies:

- As to the electrical supplies wrongfully purchased using Town funds, calculating the difference of the total amount of electrical supplies purchased by Perrotti using Town and MVFD funds, subtracting the average amount spent by the Town per building for the eight other Town buildings, and multiplying the percentage of electrical supplies paid for by the Town in that year.

| Town of Middlebury | 2011 | 2012 | 2013 |
|---|---|---|---|
| Electrical supplies | $12,786.99 | $8,246.24 | $4,557.61 |

- As to the electrical supplies wrongfully purchased by the MVFD, including all monies spent by the MVFD on electrical supplies in the years in question in light of the fact that electrical supplies, which are used for building and vehicle improvements and maintenance, would be a cost born by the Town, which owned the Fire Department building and all fire-fighting equipment.[6]

| MVFD | 2011 | 2012 | 2013 |
|---|---|---|---|
| Electrical supplies invoiced through MVFD, Inc. | $766.13 | $7,241.00 | $3,482.53 |

---

[6] To the extent that the defendant will argue that any specific disbursement was authorized by the membership of the MVFD, the Government anticipates testimony from a representative of the MVFD that the defendant did not present invoices to the membership for approval nor did members have access to the bank records of the MVFD and MVFD Ambulance accounts. In addition, the Government expects testimony that MVFD members believed that the Town would pay for any electrical supplies needed for the Fire Department, as it was a Town-owned building. Moreover, as explained below, to the extent that the defendant was seen doing work around the Fire Department, he told MVFD members that he was "donating" his time and services to do this work, and thus members were not aware that the MVFD was paying PPE and the defendant for this work.

Next, the Court is familiar with the defendant's use of Town monies to pay employees of PPE while representing to the Town that these individuals were being paid for Fire Department-related work.  *See* Gov't Exs. 47, 48, 49, 50, 51, and 52 (Town checks paid to Max Biggins); Gov't Exs. 87-95 (Town checks paid to Andrew Ubaldi).

| Town of Middlebury | 2011 | 2012 | 2013 |
|---|---|---|---|
| Payments to Max Biggins | | | $3,100.00 |
| Payments to Andrew Ubaldi | | $2,735.25 | $248.00 |

As the Court is aware, Perrotti also used MVFD funds to pay employees of PPE.  *See* Gov't Ex 72A (MVFD checks paid to Biggins).

| MVFD | 2011 | 2012 | 2013 |
|---|---|---|---|
| Max Biggins | $1,720.00 | $343.00 | |

The defendant arranged for the MVFD, Inc. to pay himself and/or PPE, and then sought reimbursement from the Town for these payments using a made-up invoice for training expenses and roof repair, which disguised the fact that he was the ultimate beneficiary of the Town payments, *see* Gov't Exs. 46A, 46B; 53A, 53B, 53C, and by using Astro Electric invoices to accomplish the same scheme.  *See* Gov't Exs. 44, 45.

| Town of Middlebury | 2011 | 2012 | 2013 |
|---|---|---|---|
| Payments to Astro Electric | $955.00 | $900.00 | |
| Payments through MVFD | | $2,000.00 | $1,450.00 |

The Government will also offer evidence of MVFD checks directed by the defendant to be paid to himself, which do not correspond to any expense reimbursement request, fire incentive

*pay,* or other legitimate expenses. *See* Gov't Ex. 301 (summary of MVFD checks paid personally to the defendant).

The Government will also offer evidence that the defendant directed that checks be paid to PPE for work purportedly done by Paul Perrotti Electric at the Fire Department. *See* Gov't Ex. 303. However, in light of the fact that any work done at the Fire Department was the responsibility of the Town and not the MVFD, Inc., there would be no reason that PPE would be hired by the MVFD to do electrical work at the Fire Department. The Government also anticipates testimony from a MVFD representative that Perrotti repeatedly represented to the membership that any work he was doing at the Fire Department was being "donated" by him, and thus the membership was unaware that the defendant was directing MVFD payments to PPE for this purported work.[7] Finally, some of these payments were for PPE-related expenses (such as t-shirts) that were not related to the fraternal or charitable activities of the MVFD.[8]

| MVFD | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|
| Paul Perrotti | $2,457.86 | $3,993.61 | $4,519.12 | $2,856.70 |
| PPE | | $6,725.00 | $11,507.45 | $500.00 |

---

[7] Of course, this is the same impression that the defendant created at trial during his direct testimony—i.e., that he was volunteering and donating his services to the Town and MVFD by doing various electrical projects at the Fire Department and at other locations such as the Wolcott Fire Academy. It was only on cross-examination, when confronted with PPE invoices to the MVFD that the defendant admitted that he had, instead, paid himself for this purported work. It is unclear whether Perrotti, in his capacity as President of the MVFD, would be barred as a Town employee by the Town charter's conflict of interest provision from awarding himself work to be done at the Fire Department but paid by the MVFD. The Government respectfully submits, however, that the Court need not resolve this issue. The bylaws of the MVFD provide that the Treasurer "shall expend no funds" unless voted on at a meeting of the membership and the members of the MVFD were not aware that the MVFD was paying the defendant and/or PPE for work done at the Fire Department.

[8] The Court inquired of the significance of the "no corresponding invoice" denomination used in para. 24 of the PSR for certain of these payments. Checks with this description reflect the fact that a bank check (authorized by the defendant) from the MVFD and MVFD Ambulance checking accounts to PPE was found by investigators, but that no PPE invoice was ever found at the Fire Department or produced by PPE. The "description" provided in this chart comes from what appears on the face of the check.

These amounts total $32,559.74.

Similarly, the Government will offer evidence that the defendant opened a Home Depot credit card in the name of the MVFD, and spent thousands of dollars at that business. To the extent that the defendant had a legitimate purchase at the Home Depot that related to the Fire Department, however, he would have been able to use the Town's account at the Home Depot. Thus, there should be no additional charges necessary at the Home Depot in connection with running the Fire Department. *See* Gov't Ex. 304 (schedule of payments made to Home Depot). These payments total $6,039.38 over the course of the years in question.

Perrotti also repaid a personal loan out of the MVFD funds. Victor Buselli was the owner of Mar-Vic cleaners, the company that cleaned the uniforms of the MVFD volunteers. On July 9, 2012, Buselli provided Perrotti with a $6,000 check with "loan payable" written in the memo line. *See* Gov't Ex. 79. While Perrotti partially repaid Buselli back with a $3,000 check, Perrotti repaid the balance of the loan by directing Kim Connors to create fake Mar-Vic cleaners invoices to the MVFD, which the non-profit then paid. *See* Gov't Ex. 213.

Finally, Perrotti fraudulent obtained thousands of dollars from the MVFD through the use of a MVFD debit card account. The debit card funds were supposed to be used for training-related expenses by the MVFD, but was instead used by Perrotti for personal items such as cash withdrawals ($7,701.60), Dunkin Donuts charges ($1,398.09), gas ($3,841.27), additional Home Depot charges ($1,713.74), and Costco charges ($203.05). *See* Gov't Ex. 305 (schedule of debit-related expenses).

Thus the Government submits the loss total as to the MVFD payments is approximately as follows:

| MVFD | 2011 | 2012 | 2013 | 2014 |
|------|------|------|------|------|
| Paul Perrotti | $2,457.86 | $3.993.61 | $4.519.12 | $2,856.70 |

| PPE | | $6,725.00 | $11,507.45 | $500.00 |
|---|---|---|---|---|
| Electrical supplies invoiced through MVFD, Inc. | $766.13 | $7,241.00 | $3,482.53 | |
| Home Depot | $1,629.93 | $3,360.55 | $1,048.90 | |
| Max Biggins | $1,720.00 | $343.00 | | |
| Kim Connors | | | $5,540.00 | |
| Mar-Vic | | $3,803.75 | | |
| Debit Account | $3,705.14 | $7,276.34 | $2,515.33 | $101.75 |

**TOTAL loss to the MVFD: $75,094.09**

Thus, the total loss for purposes of U.S.S.G. §2B1.1 is approximately **$112,159.41.**[9]

## III.   AN ABUSE OF TRUST ENHANCEMENT IS WARRANTED

The Government submits that an abuse of trust enhancement is also warranted.

Under the Sentencing Guidelines, a two-level "Abuse of Position of Trust" enhancement is appropriate "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.   "Proper application of § 3B1.3 requires satisfaction of two requirements: first, that [the defendant] occupied a 'position of trust,' and second, that [the defendant] abused that position of trust to commit or conceal his crimes."   *United States v. Nuzzo*, 385 F.3d 109, 115 (2d Cir. 2004).   The enhancement applies not only to statutorily-mandated positions or elected officials, but to a wide variety of positions.   *See United States v. Barrett*, 178 F.3d 643, 646 (2d Cir. 1999) (enhancement has been applied to police officers, security guards, babysitters, custodians, and truck drivers).

---

[9] The Government believes that in the chart set forth in the PSR two numbers related to the Home Depot charges were accidently transposed and has provided the corrected numbers to the Probation Office.  The resulting Guidelines calculation (based upon a loss of greater than $95,000) is unaffected.

Regarding the first prong, the Commentary to U.S.S.G. §3B1.3 focuses on the discretion invested in the position.  "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature."  U.S.S.G. § 3B1.3 cmt. n.1.  Whether a defendant "occupied a position of trust within the meaning of §3B1.3 is considered from the victim's viewpoint and presents a question of law subject to de novo review."  *United States v. Thorn*, 446 F.3d 378, 388 (2d Cir. 2006).

Regarding the second prong, "the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)."  U.S.S.G. § 3B1.3 cmt. n.1

Here, the evidence offered at trial shows that the defendant, as Fire Chief, occupied a position of trust—he was not only a Town employee, but head of a Town department who operated with considerable independence and authority.  The defendant was responsible for overseeing a department whose annual budget was in the hundreds of thousands of dollars; supervised a Town employee, Kim Connors, and authorized the payments out of the Fire Department budget.  As Connie Brunswick testified, if a bill came in for the Fire Department, and the defendant was not around to okay it, that bill would wait until the defendant's return.  Moreover, in his corresponding role as President of the MVFD, the defendant held a position of trust over the dozens of members of the Fire Department.

In addition, the defendant held a special skill as a licensed master electrician—i.e., a skill "not possessed by members of the general public and usually requiring substantial education, training or licensing."  U.S.S.G. §3B1.2 cmt. n.4.

As to the second prong, the evidence also shows that the defendant abused his position of trust to commit (and his special skill) to conceal his crimes.  The testimony demonstrated that it was the defendant who reviewed, approved and submitted the invoices in question that we paid by the Town and which benefitted him.  For example, it was the defendant, as Fire Chief, who knew that Max Biggins was actually doing work for PPE and not the Town, but it was the defendant whose handwriting both appears on the invoices for Biggins, and whose okay was necessary for those invoices to be paid.

## IV.    AN OBSTRUCTION ENHANCEMENT IS REQUIRED

Finally, the Government submits that an obstruction enhancement is also warranted.

Section 3C1.1 of the Sentencing Guidelines provides for a two-level enhancement "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction and any related conduct . . . ."  "Obstructive conduct can vary widely in nature, degree of planning, and seriousness," U.S.S.G. § 3C1.1 cmt. n.3, and includes such things as threatening or unlawfully influencing a witness, providing false information to a law enforcement officer, and committing perjury.  *See* id., cmt. n.4.

As to perjury, application Note 4(B) to §3C1.1 states that the two-level enhancement applies to "committing, suborning, or attempting to suborn perjury."   Perjury is defined, for purposes of the Guidelines, as "false testimony concerning a material matter with the willful

intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). The Supreme Court has affirmed a trial court's application of §3C1.1 to increase a defendant's sentence when a judge believes that a defendant has testified untruthfully. *Id.* at 97. ("It is rational for a sentencing authority to conclude that a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process."). The Supreme Court has also held that such an enhancement does not undermine the defendant's constitutional right to testify on his own behalf. *Id.* at 96 ("a defendant's right to testify does not include a right to commit perjury.").

The Government submits that an obstruction enhancement is warranted for a number of reasons because the defendant willfully attempted to obstruct and impede both the investigation and the prosecution of this matter.

First, the defendant attempted to unlawfully influence Max Biggins when the defendant first learned of the investigation. In a series of recorded phone calls initiated by the defendant on the day of the FBI search at the Fire Department, the defendant repeatedly suggested and implied to Biggins that he should not tell the FBI the truth of what happened—i.e., that the defendant paid Biggins using Town and MVFD funds for PPE-related work. The defendant also went as far as to suggest to Biggins that because Biggins had lied—by listing a Middlebury address on his application to join the MVFD—Biggins would get in trouble if he spoke to the FBI. For example, in Gov't Ex. 73A:

MB:     *Right, I understand that but what about all the other shit?*

PP:      *You, you did work for the firehouse Max.*

MB:     *Alright, but.*

PP:     *I mean.*

MB:     *Paul, we both know, you know what I mean, what should I say if it does come up?*

PP:     *You did work at the firehouse Max.*

MB:     *Alright.*

PP:     *That's what we put down on the thing.*

From Gov't Ex. 73B:

PP:     *I've never asked you to lie for anybody.*

MB:     *I know that, that's not what I'm saying but I'm freaking out.*

PP:     *Yeah, but listen, don't freak out the whole basis of your application is a lie.*

MB:     *Yeah, I understand that.*

PP:     *You know what I mean, so you are lying. So, it's not. I didn't ask you to do that you know and and I just told Marty, I said, there's, there's some times with this guy at work I said that he was involved with the fire department it started off that way and then I needed him. He said, listen, he said how many hours did he work, I said it's not much, he was one of two or three other guys that helped me out and did some stuff but 99.9% of the time you know what I mean I was paying for it.*

Also from Gov't Ex. 73B:

PP:     *I know but Max. You gotta just, you know you want to crucify me here, you know, just relax. You are not gotta you know so I'm saying, my, your favor back to me is just tell the truth, but just don't fall apart, and, just 90% of the time you were paid and you you you were doing fire department shit.*

MB:     *Right but*

PP:     *That's what it is, that's what I told them. I didn't tell you*

MB:     *That's what you told them but that's not, what if they find out that is not true.*

PP:     *There's no way of finding out.*

The defendant, apparently, believed that there was "no way" that the FBI would find out about the fact that Biggins had done work at PPE because when the defendant had met with FBI

earlier that morning, he purposely did not tell the FBI that Biggins worked for PPE.  Instead, the defendant told the agents that two others (Andrew Baldwin and Nick Santos) had worked for PPE during the years in question.

In addition to his obstructive conduct during the investigation, the defendant gave deliberately misleading and false testimony during his direct examination.  First, the defendant denied that Max Biggins or Kim Connors even did work for PPE, instead suggesting that the two volunteered their services to him as friends.  For example, as to Mr. Biggins, the defendant testified, "the word 'work' is not correct.  It was 'help me.'"  Tr., July 16, 2015, at 369.  This testimony was directly contradicted Mr. Biggins, who testified that he worked as a regular employee of PPE in 2012.  Mr. Biggin's testimony is corroborated by the regular checks from the Town, the MVFD and PPE to Mr. Biggins, which show consistent, regular payments to him for his PPE work.  Similarly, Mr. Perrotti denied that he and Ms. Connors had a "working relationship" with PPE, testifying instead that anything Ms. Connors did for him or PPE was only out of "friendship," because she was "not working for me."  Tr., July 16, 2015, at 362-363.

The defendant also deliberately mislead the jury into believing that the work he did at the Fire Department and related sites (like the Town water tower and the Wolcott Fire Academy) was work donated by him, when in fact Mr. Perrotti had paid himself for doing this work.  Indeed, defense counsel proffered to the Court (in Mr. Perrotti's presence) that testimony about the water tower and Wolcott Fire School was relevant because "the Town paid for the supplies, Mr. Perrotti did the labor free of charge for the Town."  Tr., July 15, 2015, at 103 (emphasis added).  *See also id*. at 105 ("The Middlebury Fire Department or the Town paid for the parts, Paul donated his labor.") (emphasis added).  Against this backdrop, the defendant testified on

direct about this work, maintaining the impression that he had donated his labor, and failing to

inform the jury that he had, in fact, paid himself thousands of dollars.

For example, during his direct examination, Perrotti referred to the electrical work he did

at the Town's water tank facility as part of a radio enhancement project for the Police and Fire

Departments.   The defendant did not disclose to the jury that he was paid $9,200 by

Northeastern Communications for this job.  Perrotti also did not disclose that any supplies for

this project were billed to the Town separately and did not appear on the invoices in this case.

Instead, Perrotti stated that "a radio company was hired to do the install, but some portions of

install were completed in-house by the Town in the Fire Department." Tr., July 15, 2015, at 298.

Perrotti reiterated several times that he supplied the labor and the Town supplied the materials.

During cross-examination, however, when confronted with the records provided by Northeastern

Communications that showed PPE had been paid to do the radio installation job (and not the

Town as an "in-house" project), the defendant claimed that he may have "mixed words," Tr. July

16, 2015, at 433, and that he "may have said that as an oversight," id. at 440.[10]  Perrotti also

stated:  "I didn't tell [the jury about the payment by Northeastern Communication] because that's

what I billed the Town for.  I did the conduit job on Saturday.  I didn't bill the Town.  The Town

supplied the labor.  And, quite frankly, there was people that didn't want to climb the tank and I

did it on a Saturday."  Id. at 441.  While this last statement is nonsensical, what is clear is that the

defendant lied to the jury when he told them that the electrical work he completed for the radio

enhancement project was done "in-house" by the Fire Department.

---

[10] Mr. Perrotti was likely surprised by the fact that the Government had found out about the
Northeastern Communications invoice because PPE had not produced this document to
the Government in response to the subpoena issued to it; instead, the Government only received this
invoice from Northeastern Communications on the morning of the defendant's second day of
direct examination.

Similarly, the defendant gave false and misleading testimony as to Astro Electric, a company that submitted invoices to the Town of Middlebury for work that was completed by Perrotti.  *See* Gov't Exs. 44A-44D, 45A-45D.   Perrotti testified:

> A. It wasn't a false invoice.  It was a subcontractor/contractor arrangement between Astro and myself.  I performed the work. Astro paid me the work.  He was entitled to charge for the lift, et cetera.  Astro's bill went to the Town which was signed off by the First Selectman.
> . . .
>
> Q. Astro did no work whatsoever, correct?
>
> A. Astro subbed me out to do the job.

Tr., July 16, 2015, at 551, 552.  But Ronaldo Shortell's testimony established that there was not a subcontractor/contract relationship between Astro and Perrotti:

> Q. And after he left your employment and started his own business, did there come a time where he asked you any favors with respect to the Middlebury Fire Department?
>
> A. Well, I don't know if they were favors.  He had a few jobs that were in the Fire Department.  He was always the only one he wanted to work in the Fire Department.  So he expressed to me that he had a few jobs, but he couldn't do them because he felt it was a conflict of interest with the Town, being the Fire Chief.  So he would ask me, "Do you mind if I do them through Astro?  You could bill it.  I'll tell you want to bill the Town and you could pay me."  I said, "That's fine."
> . . . .
>
> Q. Do you know what work, specifically that Mr. Perrotti did?
>
> A. No.

Tr. Shortell, July 10, 2015, at 7-8.  Astro did not "sub" Perrotti out to do the job.  Astro never was awarded the project by the Town or the MVFD so it could not "sub" it out to Perrotti, even if it wanted to.  Perrotti awarded himself the project and then arranged for Astro to submit the

invoice to the Town so Perrotti could disguise the fact that PPE was getting paid and avoid

violating the Town's conflict of interest policy.  He falsely testified that with regard to the

invoices in Gov't Exs. 44 and 45, the relationship between Astro and Paul Perrotti Electric was

legitimate.

Finally, the defendant made a number of false statements during his direct testimony as to

the electrical supplies that he used and the projects that he did at the Fire Department:

For example, in his direct testimony, Perrotti testified about his preparations for the 9/11

ten-year anniversary ceremony.  The Government's evidence demonstrated that Perrotti's

testimony was false.  Perrotti testified that "a lot of material" was used to prepare for the 9/11

ceremony.  Tr., July 14, 2015, 61.  More specifically, when describing Def.'s Ex. K36A, Perrotti

stated, "This is our truck bay.  And this depicts lights that were put on our truck bay floor in

conjunction with the town wide celebration."  Id.  Perrotti continued, "This was the lights to

illuminate where we had a little stage.  We had colored lights.  We had conduit, the wire, the

control box."  Id. at 61-62.  Perrotti also claimed that the PA system depicted in Def.'s Ex. K60,

was "in conjunction with the 2011 ceremony, wiring and stuff for the PA system."  Id. at 76.  See

also id. at 89 (referring to Def.'s Ex. K80: "It's part of it was part of the 9/11 thing that we had

done, and it is the speaker and the wire and the pipe.").  The untruthfulness of his testimony was

elicited during his cross-examination:

> Q. The lights were not upgraded and the sound system was already
> installed, and your intention was to suggest that you had done
> lights and audio for September 11 event that an independent
> contractor had already been hired for?
>
> A. No, it's not correct.  It's not correct.  I said we geared up for
> 9/11.  We did other things throughout the building to enhance the
> building track lighting because we had a lot of public there. . . .
> . . .

> Q. In fact, these lights have been installed for years, Mr. Perrotti, correct?
>
> A. The lights have been there for about 10 or 12 years. . . .

Tr. July 16, 2015, at 525, 529.  In addition, contrary to Perrotti's testimony on direct that there were lights to illuminate "where we had a little stage," he admitted during cross-examination that there was no stage set up in the garage bays for the 9/11 ceremony.  Id. at 527.

Perrotti also testified that an electric panel used for temporary service, depicted in Def.'s Ex. K22, was "bought in conjunction with the 2011 9/11 ceremony which marked the ten-year anniversary of that."  Tr. Perrotti, July 14, 2015, at 45.  But, as the Government's evidence demonstrated, the panel was never used during the 9/11 ceremony because the MVFD hired an outside company to provide the lights, stage and audio/visual equipment.  Indeed, the panel was not purchased in 2011 and did not appear on the invoices at issue in this case.  Perrotti was truthful when he originally stated that the electrical panel was "used for our fairs and our other stuff that we put on as a fire department," id. at 46.  But, then he chose to embellish his testimony with a lie to persuade the jury that the panel was purchased in 2011.  Perrotti's testimony went beyond mistake; Perrotti testified falsely when he described the work he did and the materials he used in preparation for the 9/11 ceremony.

The defendant also stated that the generators depicted in Def.'s Ex. K115, "were purchased in the time frame of the first storm in August 2011."  Tr., July 15, 2015, at 129. Perrotti referred to a letter that he had written to the Town of Middlebury requesting permission to purchase a generator.  Id. at 131.  Although the letter stated that the generator was for the firehouse, Perrotti stated that the generator was actually needed to assist the community and that he "could have clarified a little better."  Regardless, the letter was written in March 2011, prior to

the storm Perrotti referred to in his testimony.  When confronted with this fact during the cross-examination, Perrotti stated: "Well you know, there was definitely a storm obviously before that. . . . Yes, it was a mistake on my part.  There's a lot of things going on.  I didn't look at the date.  But there had to be a storm to write that letter.  I wouldn't fabricate a story."  Tr., July 16, 2015, at 453.  The Government submits that Perrotti did, in fact, fabricate a story.

Perrotti also stated that the generator in Def.'s Ex. K120 was "purchased through Standard Electric during the storm 2011."  Tr. July 15, 2015, at 135.  During cross-examination, however, Perrotti claimed that he did not "recall saying that that particular generator was purchased for the storm, but [he] know[s] it was purchased in the time frame."  Tr., July 16, 2015, at 456.  This generator was not purchased in 2011.  The Government presented evidence that the generator had a sticker on it that indicated that the next service due date for the generator was "'08'".  Gov't Ex. 201.  In addition, this generator was not on any of the invoices in this case.  Again, Perrotti offered false testimony to persuade the jury that the pictures of the materials and supplies at the firehouse were the same materials and supplies on the invoices, purchased during the 2011, 2012, and 2013 time frame for the benefit of the Town of Middlebury.

Perrotti described items in a white trailer in the firehouse's parking lot, which he claimed were purchased in 2011, 2012 and 2013 for the benefit of the town.  See Tr., July 14, 2015, at 42-46.  While much of his testimony concerning the items in the trailer was misleading, parts of the testimony were outright lies.  For example, Perrotti specifically points out "two portable electric heaters which are referenced on the invoice" and were purchased in 2012.  Id. at 45.  These heaters, however, were not the heaters referenced in the invoices.  When Perrotti was confronted with this fact, he claimed that the heaters were "stacked up in the corner.  [He]

assumed that all the heaters, at least when [he] was Chief, went back orderly," Tr., July 16, 2015, at 543. He eventually admitted that the heaters in the picture were not the heaters on the invoice and that he had not, in fact, seen the heaters on the invoice in the trailer.  Id.

In his direct testimony, Perrotti stated that Defendant's Exhibit K9 depicted "where the red globe was."  Perrotti was asked specifically if he "install[ed] the red globe."  And Perrotti responded that he "did install it," but that the "town replaced the light fixtures over my absence and they removed the red globe light."  Tr. Perrotti, July 14, 2015, at 35-36.  Perrotti later stated that Def.'s Ex. K29 was "a reference to where the red globe was in relationship to the emergency phone."  Id. at 56.  This testimony was not true—Perrotti did not install any red globes.  He admitted this during cross-examination:

> Q. And in fact, no red globes were ever installed at the Fire Department?
>
> A. Red globes were purchased for the intent of changing the globes, you've seen many of them, changing them to the outside to a red globe.  And they were purchased.
>
> Q. I believe it was your testimony that there were red globes that had been installed, that's what you previously testified?
>
> A. I don't believe I testified to that.  I said there was a red globe fixture in front of the fire emergency phone, okay?  And that was the intended fixture that we were using for the fire phone. . . .
>
> A. I'm testifying that they were purchased but they weren't installed.  But the fixtures can accommodate these globes.

Id. at July 16, 2015, at 546-547.  Perrotti feigned never having testified that the red globes were actually installed at the firehouse.  But Perrotti was clear when he told the jury the red globes were no longer at the firehouse—he said that he installed them, and the town removed them. The Government's evidence demonstrated that his original testimony regarding the installation

of the red globes was false.  His testimony was a lie made multiple times and intended to persuade the jury that he had not misappropriated the many red globes he purchased using the Town's money.  But the record shows that no red globes were installed, and no red globes were found at the firehouse.

Finally, the evidence shows that the defendant lied in connection with his use of an MVFD debit card to make purchases at a local gas station.  When asked about these charges during cross-examination, Perrotti claimed that the "gas is actually propane. . . . for the grill," Tr., July 16, 2015, at 502, including the gas station charges in January, February and March of 2011.  When asked if it would surprise him that charges at the gas station in 2012 were on almost a weekly basis, Perrotti changed his explanation for the charges: "It could also be the gas cans that I used to have junior fill up.  We used to fill up the gas cans versus go the PD.  I used the debit card to put gas in my Town vehicle probably a bunch of times."  Id. at 504.  Perrotti was then asked if he filled up his personal cars using the MVFD debit card:

> Q. I didn't ask about your business, Mr. Perrotti.  I asked about your personal cars.
>
> A. That is not true.
>
> Q. So it's your testimony and let me just take a step back.  When I asked you about the gas charges, you said it was for propane only, correct, when I initially asked you?
>
> A. Well, I didn't want to read too much of the question.  It was for propane, gas cans and, as I stated before to other people that questioned on this, there was many times where I had zero gas.  I was in route to a call, as funny as it seems, and I put ten or twenty dollars' worth of gas in my Town vehicle.  I believe you had testimony from several people that saw me filling it up.
>
> Q. Mr. Perrotti, when I first asked you about the debit card being used at the gas station, your answer was that it was for propane.
>
> A. Yes, that's right.

Q. And then when I started talking about the number of charges at
the gas station, that's when you added all of a sudden –

A. You jogged my memory.  I will say you jogged my memory
with respect to that. . . .

Id. at 505-506.  The Government submits that Perrotti lied when he attempted to explain away

the weekly gas station charges on the MVFD debit card—he used the debit card at local gas

stations to fill up his personal vehicles, not for, as he claimed, buying propane on a weekly basis

in the middle of winter for an outdoor grill.

The totality of all of this evidence—from the defendant's actions at the start of this

investigation through his testimony at trial—shows that the defendant engaged in a deliberate

and sustained attempt to impede and obstruct the investigation.  A two-level enhancement under

U.S.S.G. §3C1.1 is therefore required.

**V.      CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the Guidelines

calculations set forth above be applied by the Court based upon a preponderance of the evidence.


Respectfully submitted,


DEIRDRE M. DALY
UNITED STATES ATTORNEY
        /s/


SARAH P. KARWAN
ASSISTANT UNITED STATES ATTORNEY
Fed. Bar No. ct22911

HEATHER L. CHERRY
ASSISTANT UNITED STATES ATTORNEY
Fed. Bar No. phv07037

157 Church Street, 25th Floor
New Haven, CT 06510
(203) 821-3700
sarah.p.karwan@usdoj.gov
heather.cherry@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2015, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/

SARAH P. KARWAN
ASSISTANT UNITED STATES ATTORNEY